John WOOD, Appellant,

v.

SUPERIOR COURT, State of Alaska, Third Judicial District, Appellee.

No. 7386.

Supreme Court of Alaska.

Oct. 30, 1984.

John W. Wood, Anchorage, pro se.

Robert H. Wagstaff, Anchorage, for Anchorage Bar Association, amicus curiae.

Elizabeth L. Shaw, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for the State of Alaska, amicus curiae.

Before BURKE, C.J. and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

In *Jackson v. State*, 413 P.2d 488, 490 (Alaska 1966), we recognized "a tradition deeply rooted in the common law":

[A]n attorney is an officer of the court assisting the court in the administration of justice, and ... as such he has an obligation when called upon by the court to render his services for indigents in criminal cases without payment of a fee except as may be provided by statute or rule of court.

This appeal requires us to re-examine the nature of this obligation and the manner in which it may be enforced.

### I

John Wood is an Anchorage attorney. On July 15, 1981, he was appointed to represent an indigent defendant charged with committing nine different offenses. Most indigent defendants are represented by the Public Defender.[1] When, as in this case, the Public Defender is unable to represent a particular defendant, the private bar is, by court rule,[2] required to cover that defendant's case. In Anchorage, the court system's administrative director had, by contract, arranged for an Anchorage firm to handle most cases in which the Public Defender was disqualified due to conflicts; but this firm, too, recognized a conflict of interest in this particular case and was unable to represent the defendant. This case, then, reached the third tier of attorneys: a list of private attorneys, compiled pursuant to a superior court order. Wood's name was on the list, and he was appointed.

Claiming that he was not competent in criminal matters and that for this reason the defendant's right to effective assistance of counsel would be impaired, Wood refused to accept the appointment. District Court Judge (now Superior Court Judge) Cutler referred the matter to Presiding Judge Moody, whose 1979 order had created the list from which Wood's name was selected. Meanwhile, Judge Cutler assigned another attorney to the case. Two weeks later, Judge Moody issued an order for Wood to show cause why he should not be held in contempt. After several hearings, during which alternatives to the existing court-appointed counsel system were discussed, Judge Moody concluded that the existing system was constitutional and stated that he did not "feel compelled to excuse [an] attorney from service on a mere assertion to the court that [the attorney] is incompetent to represent a criminal defendant." Judge Moody found Wood in contempt and ordered him to pay a $500 fine. From this decision Wood, supported by Amicus Curiae Anchorage Bar Association, now appeals.

### II

The order Wood is attacking reads, in full, as follows:

### ORDER

The Supreme Court has announced that, effective July 1, 1979, counsel appointed to represent defendants in criminal cases in which the Public Defender has established a conflict exists will be compensated at the rate of $40 per hour with a maximum of $1,500 in misdemeanor and $2,500 in felony matters.

The Alaska Court System expenditure transactions reflect approximately two hundred ten (210) appointments of counsel in criminal conflict cases during the calendar year of 1978.

As *the Greater Anchorage telephone directory contains approximately four hundred seventy (470) names of lawyers engaged in the private practice of law,*

*IT IS ORDERED that a list be established which will contain the name of each lawyer above-described. The order in which the names will appear on the list will be from a drawing, and it will*

---

1. The Public Defender Agency is part of the Department of Administration. *See* AS 18.85.-010–.180.

2. Administrative Rule 12.

*be the responsibility of each attorney so appointed to provide legal representation or to arrange for another attorney to provide said representation.*

If, during the preceding six-month period, any lawyer has been appointed to represent a defendant in a criminal matter, and so requests, his name will appear at the end of the newly established list.

Any lawyer who has been admitted to practice in Alaska for less than one year may request and have only misdemeanor assignments for a period of not more than one year.

IT IS FURTHER ORDERED that similar lists will be established for Palmer, Kodiak, Kenai and Valdez. In the event that hardships result in small communities from the lack of adequate numbers from which to rotate assignments, with approval from this office, appointments may be made from the Anchorage list or other convenient locations.

DATED at Anchorage, Alaska, this 22nd day of June, 1979, with an effective implementation date of July 1, 1979.

/s/ _____
Ralph E. Moody
Presiding Judge
Third Judicial District

(Emphasis added).

Analytically, one can best understand Wood's objections to this order by dividing them into two categories. One set of objections depends on the fact that under the order some attorneys are required to pro-

vide services to people they would rather not represent at rates they consider inadequate. The other set of objections concerns the fact that some of the attorneys called upon to represent criminal defendants may not be competent practitioners of criminal law. We discuss these objections in turn.

### III

██ Wood first argues that courts do not have legal authority "to coerce one class of persons to involuntarily provide services to a second class of persons when no contractural [sic] or tortious relationship exists between them." We rejected a similar argument in *Jackson* and see no reason to reverse now. Lawyers have traditionally been responsible for representing indigent clients, and courts have traditionally supervised the terms and conditions of this representation. Wood offers no authority for the proposition that this practice unconstitutionally encroaches on the executive or legislative domain and we can perceive none.[3]

██ Nor do we accept Wood's argument that courts do not have power to issue orders like the one he attacks. Article IV, section 15 of the Alaska Constitution gives this Court authority to make and promulgate "rules governing the administration of all courts" and "rules governing practice and procedure in civil and criminal cases in all courts." Under this authority, we promulgated what is now designated as Administrative Rule 12,[4] which requires the

---

**3.** This does not mean that the Legislature may not create agencies which will represent indigent criminal defendants. Indeed, a bill establishing an Office of Public Advocacy, which will among other things represent indigent defendants "who cannot be represented by the public defender agency because of a conflict of interests," went into effect on July 1, 1984. Ch. 55, SLA 1984.

The Office of Public Advocacy eliminates the need for the statutory scheme set out in AS 18.85.130(a), which now provides:

Sec. 18.85.130 *Substitute defender.* (a) For cause, the court may, on its own motion or upon the application of the public defender, appoint an attorney other than the public defender to represent the indigent person at any

stage of the proceedings or on appeal. The attorney shall be awarded reasonable compensation according to a schedule of fees promulgated by the supreme court and reimbursement for expenses necessarily incurred. This shall be paid by the court system.

**4.** Administrative Rule 12 reads in pertinent part:
Rule 12. Appointment and Compensation of Court Appointed Attorneys in Criminal Cases.
(a) The presiding judge shall designate the area court administrator and a clerk of court for each court location in his district to keep and make available to the court in each location a list of attorneys eligible to receive court appointments to represent indigent persons in criminal cases.

presiding judge in each of our four judicial districts to maintain lists of attorneys eligible to receive court appointments to represent indigent defendants in criminal cases. Presiding Judge Moody issued his orders pursuant to this rule, and Wood does not argue that we unconstitutionally delegated our responsibility to the judge.[5]

■ Nor does an order requiring an attorney to represent a criminal defendant necessarily take that attorney's private property without just compensation. *Jackson*'s holding on this issue is consistent with the "vast majority" of federal and state courts decisions. *See Williamson v. Vardeman*, 674 F.2d 1211, 1214–15 (8th Cir.1982), and the cases cited therein. It may be that in some extreme cases an assignment would cripple an attorney's practice and thus rise to the level of a taking. *See People v. Randolph*, 219 N.E.2d 337 (Ill.1966), and Annot., 18 A.L. R.3d 1074 (1968). But Wood has not shown that this is an extreme case. Moreover, under Administrative Rule 12(h) the court system's administrative director may, "[i]f necessary to prevent manifest injustice, ... authorize payment of compensation or expenses in excess of the amounts [otherwise] allowed under this rule." [6]

Wood also argues that the order denies him equal protection of the law. On the record before us, we cannot agree. His claim that the list of eligible attorneys arbitrarily fails to comply with the superior court's order is based on a comparison of the names on the list with the names listed in the attorneys' section of the 1981 Anchorage telephone directory. But the list was compiled based on the 1979, not the 1981 directory, and Wood has not shown that the court system has failed to update the list. Nor has he supplied sufficient evidence for his claim that "attorneys for a privileged client such as a bank or insurance company" routinely escape their responsibilities under the order. It is also clear that these specific objections were not raised before the superior court. Thus, we need not rule on Wood's claim that the way the list was prepared and used violated his equal protection rights.[7]

■ The Anchorage Bar Association emphasizes that counsel in Wood's position may not receive as much compensation as would counsel working under contracts with the court system. It notes that under Administrative Rule 12 "third-level" counsel receive a maximum of $2,500 per felony, while the court system's contracts provide that attorneys working for "conflict firms" may receive up to $8,000 in unclassified felony cases and up to $3,000 in less serious felony cases. We first point out that in this case an unclassified felony is not involved. We also think that elementary economic theory explains the difference

(b) The lists of eligible attorneys shall be compiled and provided to the courts by the Alaska Bar Association.

(c) The presiding judge may in his discretion order that all attorneys residing near a court location within his district be placed on the list of eligible attorneys if the presiding judge determines that the number of attorneys on the list is inadequate to provide equitable distribution of appointments among available attorneys.

(d) Appointments shall be made from the list on a rotating basis as far as is practical and possible, and the court may, in departing from a strict rotation basis, take into account the complexity of the case and the level of experience required by counsel.

5. To the extent that Wood is arguing that judges lack the inherent authority to hold citizens in contempt, his argument is equally meritless. *Cf., e.g., Bloom v. Illinois*, 391 U.S. 194, 198 n. 2,

88 S.Ct. 1477, 1480 n. 2, 20 L.Ed.2d 522, 527 n. 2 (1968) (briefly summarizing one part of the history of the contempt power); *State v. Browder*, 486 P.2d 925, 938–39 & n. 47 (Alaska 1971) (recognizing and placing limits on "the inherent power of courts to punish summarily for contempt.")

6. Our rule does not (and should not) preclude the Legislature from appropriating money to fund compensation in excess of the amounts specified by court rule. As we said in *Jackson*, "the problem of securing funds to pay the amount now permitted by court rule, or to pay larger sums than those presently permitted, is entirely a matter for decision by the legislature." 413 P.2d at 490.

7. *See Young v. Williams*, 583 P.2d 201, 206 (Alaska 1978) (factual argument not raised below will not be considered on appeal).

between the $3,000 limit on fees a "conflict firm" might have received in this case and the $2,500 limit on fees Wood might have received. In contracting for "second-level" representation, the court system, represented by its administrative director, quite understandably had to offer "second-level" firms an incentive to enter into contracts. The administrative director apparently decided that the advantages a "second-level" firm could offer were worth the added expense. We conclude that the $500 difference bears a fair and substantial relationship to the court system's goal of providing reliable and competent representation for individual defendants.[8] In short, if we assume for purposes of argument that all attorneys are competent in criminal law, we see no constitutional infirmities in the superior court's order.

### IV

■ Not all attorneys, however, are competent in criminal law. We do not think that lack of experience in criminal cases will always justify an attorney's refusal to represent an indigent criminal defendant. "It would seem that any member of the bar, even without 'expertise in criminal matters,' should be able without undue burden to prepare himself to represent a defendant in a misdemeanor case, just as he could prepare himself to draw a type of contract which he had not drawn before." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1216 (1972). In such a case an inexperienced attorney who decided to represent the defendant would not necessarily be violating Disciplinary Rule 6–101 of the Code of Professional Responsibility, which provides in pertinent part:

> A lawyer shall not ... [h]andle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

Yet it is all too obvious that "in some instances an appointed lawyer who prepares diligently will nevertheless be unable to prepare himself sufficiently to be competent to represent the defendant," Informal Op. 1216, *supra,* and that in those instances the appointed lawyer should not bear primary responsibility for the case. The American Bar Association's Committee on Ethics and Professional Responsibility suggests that attorneys finding themselves in this situation should ask the court to appoint, "as associate or co-counsel, an additional lawyer who is competent to handle the matter in question." *Id.*

■ A rather different approach to this problem is embodied in Judge Moody's order that Wood is attacking. If an attorney decides not to represent an indigent defendant, the attorney must "arrange for another attorney to provide ... representation." When Wood refused to take the case to which he was assigned, Judge Cutler informed him that at least two local attorneys were willing to take cases that other bar members were unable to handle. Suspecting that he would have to "pay out of my own pocket" for this alternative representation, and objecting on principle to this imposition on him, Wood refused to follow the course Judge Cutler outlined. On appeal, Wood and the Anchorage Bar Association argue that this order establishes an outmoded and constitutionally defective system. In part, we agree. If an attorney cannot practice criminal law competently, forcing that attorney to hire a replacement takes the attorney's property without just compensation.

In 1967, the American Bar Association's Project on Minimum Standards for Criminal Justice approved programs in which "[e]very lawyer licensed to practice law in the jurisdiction, experienced and active in trial practice, and familiar with the practice and procedure of the criminal courts, [is]

---

8. We also note that while the court system's contracts with the "second-level" firms provide that the firms may petition the administrative director for reimbursement of extraordinary expenditures, the contracts do not seem to permit extraordinary compensation in excess of contractual limits. In this regard "third-level" attorneys, who may petition for extraordinary compensation under Administrative Rule 12(h), are better off than "second-level" firms.

included in the roster of attorneys from which assignments are made." ABA Standards Relating to Providing Defense Services § 2.2 (1967). The Advisory Committee's commentary noted that "it is not necessary to limit participating to those who are experts in criminal law." Experienced and active trial lawyers with "some experience" with criminal cases were deemed competent to represent criminal defendants. But we can take judicial notice that criminal procedure, to say nothing of the substantive criminal law, is more complicated than it was in 1967, and the commentary to the most recent set of ABA Standards reflects this fact. "The practice of criminal law has become highly specialized in recent years," an ABA task force has reported,

> and only lawyers experienced in trial practice, with an interest in and knowledge of criminal law and procedure, can properly be expected to serve as assigned counsel. While it is imperative that assigned counsel possess advocacy skills so that prompt and wise reactions to the exigencies of a trial may be expected, this alone is not deemed sufficient. There must also be familiarity with the practice and procedure of the criminal courts and knowledge in the art of criminal defense.

ABA Standards for Criminal Justice, § 5–2.2, at 5–27. Thus, the ABA explicitly "rejects the notion that every member of the bar admitted to practice in a jurisdiction should be required to provide representation."

 Of course, the fact that the ABA believes a practice to be undesirable does not make that practice unconstitutional. Yet the passages we have just quoted establish that in some circumstances an attorney may be ethically bound to ask to be relieved of appointment to a criminal case. Forcing an inexperienced attorney to represent a criminal accused will often deny that defendant effective assistance of counsel.[9] Forcing the incompetent attorney to hire a replacement raises a less serious but still significant constitutional problem. A court may require an attorney to represent an indigent defendant without compensation, but requiring the attorney to pay defense expenses out of his or her own pocket takes the attorney's private property. *Williamson v. Vardeman*, 674 F.2d 1211, 1215–16 (8th Cir.1982); *State v. Robinson*, 465 A.2d 1214, 1216–17 (N.H.1983); *cf. Wolff v. Ruddy*, 617 S.W.2d 64, 67 (Mo. 1981). We think the cost of hiring a replacement attorney can justly be called an "expense" for which an incompetent attorney must be compensated, and we see nothing in the superior court's order or in the handling of this case to suggest that attorneys who ethically must hire replacements are in fact reimbursed for this kind of expense. If an attorney can demonstrate that he or she cannot ethically take a case to which he or she has been assigned, forcing that attorney to hire a replacement is unconstitutional.

 Attorneys who can competently handle a case they are assigned are in a quite different position. If they arrange to hire a replacement, they then cannot justly claim that an ethical rule has prevented them from taking the case. In such a situation the added expense of hiring a replacement should be borne by the attorney, not the taxpayers. We hold that if an attorney is competent to handle the criminal case to which he or she is assigned, the fact that the attorney hires replacement counsel does not convert the order assigning the attorney to the case into a taking.[10]

9. However, inexperience alone does not justify a presumption of ineffectiveness. *U.S. v. Cronic*, —— U.S. ——, ——, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657, 672 (1984).

10. A study by the Alaska Judicial Council shows that in the years 1976–1979 defendants represented by court-appointed counsel received, on average, significantly longer sentences than did defendants represented by privately hired attorneys or by the Public Defender. Amicus suggests that this problem has been caused by the court system's decision to require most private attorneys to accept some criminal cases or arrange for alternative representation. The record does not support this assertion. Nor can we see how the superior court's order, issued in the summer of 1979, could have produced these discrepancies, which occurred during the 1976–

V

 We now must determine how these general considerations affect the case before us. When she decided not to excuse Wood from his appointment, Judge Cutler explained,

> I'm very sympathetic with Mr. Wood's situation, but these are (Pause) I believe they are all pretty simple misdemeanors. I don't see any reason to depart from treating him the way other persons are treated, so I don't find this is a criminal case of particular, that requires particular experience. It appears that he does have some prior experience in criminal law . . . .

Wood himself stated that he had handled some criminal cases until 1973. Judge Moody pointed out that in working for the Court System as a law clerk Wood had dealt with criminal matters. On this record we cannot say that he was not competent to practice criminal law or that indigent defendants represented by him would necessarily have received ineffective assistance of counsel.

 Like Judge Moody, we specifically reject the argument, advanced by counsel for the Bar Association, that an attorney's statement that he or she is not competent to take a particular case should automatically excuse the attorney from providing representation. Unless attorneys who do not want to handle criminal cases are required to demonstrate that ethical requirements prevent them from accepting an assignment, some attorneys will inevitably avoid taking cases that they could in fact handle competently. A showing that an attorney is not competent must be made to the court. If the court determines that the attorney is in fact competent and the attorney still refuses to take the case, he or she may be held in contempt if proper procedures are followed. *See* Annot., 36 A.L. R.3d 1221 (1971). We now turn to the question of whether the procedures followed in this case were proper.

VI

Wood contends that he was denied his constitutional right to trial by jury. We agree. Before explaining why this is true, however, we are compelled to offer one observation about the nature of the proceeding in which Wood was involved. Wood's refusal to represent an indigent defendant gave the superior court an opportunity to solicit several different views on the ways in which an appointed-counsel system should work. Our review of the record reveals an informal, almost collegial inquiry, in which Wood himself played a relatively minor role and various amici were invited to expound on how criminal defendants should be represented. Very little evidence was taken and Presiding Judge Moody's conclusions seem to have been based on his own long and varied experience on the bench. The difficulties of making policy while at the same time conducting an adjudication have troubled many authorities, the United States Supreme Court among them. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); 2 K. Davis, *Administrative Law Treatise*, § 7.25 (2d ed. 1979). Wood does not argue that the superior court denied him due process of law, and we doubt that it did. But the record shows that once the superior court had concluded that its order was valid—and the collegial inquiry had ended—its decision to hold Wood in contempt was well-nigh automatic.

 Wood was entitled to a jury trial. When the superior court issued its show-cause order, Judge Cutler had already appointed another attorney to handle the case Wood had refused to take. For this reason it would have been impossible for Wood then to have accepted the appointment, and the contempt hearings' purpose, aside from helping the superior court design an appointed-counsel rule, could only have been to punish Wood for his defiance. Even if a contempt proceeding is

1979 period. The Anchorage Bar has called our attention to a problem which clearly deserves

investigation, but the case before us is not the appropriate forum for the inquiry.

formally classified as civil, it is "most accurately characterized as a criminal trial" if the sentence or fine threatened "is intended to punish the contemnor for prior acts." *Pharr v. Fairbanks North Star Borough,* 638 P.2d 666, 669 (Alaska 1981). *See also Gwynn v. Gwynn,* 530 P.2d 1311, 1312–13 (Alaska 1975); *Johansen v. State,* 491 P.2d 759 (Alaska 1971). According to *Baker v. City of Fairbanks,* 471 P.2d 386, 402 (Alaska 1970), the right to jury trial extends to "any offense a direct penalty for which may be incarceration in a jail or penal institution." [11] "It must also include," we said, "offenses which, even if incarceration is not a possible punishment, still connote criminal conduct in the traditional sense of the term." In a footnote we explained that "[a] heavy enough fine might also indicate criminality because it can be taken as a gauge of the ethical and social judgments of the community." 471 P.2d at 402 n. 29.[12]

■ Judge Moody's show-cause order did not limit the potential punishment to which Wood was exposed. Had the superior court invoked Civil Rule 95(b), which allows courts to order fines of up to $500, we would have had no difficulty in rejecting Wood's jury trial claim. But it is clear from the record that the superior court was relying on the contempt power, not Civil Rule 95(b).[13] In Alaska the potential punishment, not the sentence or fine actually imposed, determines whether a person is entitled to a trial by jury. *See Baker,* 471 P.2d 386 at 401–02; *cf. State v. Browder,* 486 P.2d 925, 933–40 (Alaska 1971). Here the potential punishment was not specified,

the contempt was punitive, and Wood was wrongfully denied a trial by jury.[14] The judgment against him cannot stand.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.

BURKE, Chief Justice, concurring in part, dissenting in part.

I strongly disapprove of that part of the presiding judge's standing order permitting appointed counsel to "provide legal representation *or to arrange for another attorney to provide said representation.*" (Emphasis added.) Such language suggests that counsel can fulfill his professional obligation by simply hiring a replacement.

The responsibility for selecting and appointing counsel in cases such as this belongs exclusively to the court. The court should exercise its appointment power with due regard for the complexity of the case, the experience and circumstances of counsel, and other relevant factors. The court should not, however, delegate any part of its responsibility to counsel. Thus, the court should either enforce its order, or relieve counsel of his obligation and make a new appointment. Insofar as our opinion today approves of any other practice, I dissent.

I dissent also on the issue of Wood's right to a jury trial. I would take this opportunity to overrule our decision in *State v. Browder,* 486 P.2d 925 (Alaska 1971), to the extent that it provides that right in the instant case. The rule that I

---

**11.** We note that direct criminal contempt committed in the presence of the trial judge may be dealt with summarily without a jury trial. *See* Alaska R.Civ.P. 90(a); *see also Weaver v. Superior Court,* 572 P.2d 425 (Alaska 1955). However, this exception to the general rule does not apply in the present case.

**12.** The Alaska Constitution's right to trial by jury extends well beyond the corresponding Federal right. Compare *Baker* with *Frank v. United States,* 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969).

**13.** *Contrast, Tobey v. Superior Court,* 680 P.2d 782 (Alaska, 1984) (Rule 95 relied on, contempt power not mentioned).

**14.** The questions to be decided by the jury do not include whether Wood was competent to take the cases to which he was assigned, as that question is for judicial determination. See page 1232, *supra.* Jury questions do include whether there was an order of appointment, whether Wood had knowledge of the order, whether Wood violated it, and whether some legally sufficient set of circumstances, other than his purported lack of competency, excused any violation.

would adopt is the one advocated by the late Chief Justice Boney, in his concurring opinion in *Browder.*

Otherwise, I concur in the opinion of the court.

MATTHEWS, Justice, concurring.

It is my opinion that most skilled civil trial attorneys can provide a competent defense in most criminal cases. A trial lawyer's persuasive talents are as applicable to criminal cases as to civil cases. When a civil lawyer takes on a new case a substantial amount of research ordinarily is required, even if the case is in a field of law in which the lawyer regularly practices. Criminal case assignments will also require the attorney to do legal research. This preparation is not different in kind from what he must do to do his job adequately in any litigation he undertakes.

In accordance with the above, I could not state with confidence, as the majority does at page 15, that forcing an attorney inexperienced in criminal law to represent a criminal accused will often deny the accused effective assistance of counsel. My reading of the cases in which ineffective assistance has been raised indicates that inexperience has often been raised as a ground

for an ineffective assistance claim, but not often successfully.[1]

Further, I would not assert as the majority does at page 1231 that criminal law and procedure are now more complicated than they were in 1967. This statement seems to be founded more on nostalgia than fact. There is a natural tendency to look at the past as a more simple time. However, in a dynamic system there are always issues that are new whose implications are not yet known. The criminal law issues of the 80's may be different from those of the 60's, but that does not make them harder.[2]

Other than in the respects noted above, I concur in the majority opinion.

COMPTON, Justice, dissents "from that part of the opinion which holds that the government, acting through the judicial branch, may coerce a private citizen to perform free services for governmental purposes. A full dissent will follow."

---

1. *See, e.g., Green v. State,* 579 P.2d 14, 16 (Alaska 1978) ("The test [for ineffectiveness of counsel] is whether his performance was below what would be expected of a lawyer with experience, not whether he in fact had that experience."); *Tucker v. State,* 482 S.W.2d 454 (Mo.1972) (lack of previous experience in the trial of criminal cases, as distinguished from civil cases, does not of itself demonstrate ineffective assistance); *Hawkins v. State,* 269 Ind. 16, 378 N.E.2d 819 (1978) (inexperience does not necessarily amount to ineffective representation unless the trial, considered as a whole, is reduced to a mockery of justice, shocking to the conscience of the reviewing court); Annot., 2 A.L.R. 4th 27, 196–199 (1980).

2. The issues of the 60's were reflected in such landmark cases as *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).